SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
RICHARD M. STEINGARD (Cal. Bar No. 106374)
ANGELA J. CLIFFORD (Cal. Bar No. 253778)
333 South Hope Street, 48th Floor
Los Angeles, California 90071-1448
Telephone: 213-620-1780
Facsimile: 213-830-2036
RSteingard@sheppardmullin.com
AClifford@sheppardmullin.com

Attorneys for Third-Party
TAYLOR THOMSON

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  v.<br><br>ANTHONY PELLICANO, et al.,<br><br>  Defendant. | Case No. CR 05-1046(E)-DSF<br><br>**NOTICE OF MOTION; MOTION OF THIRD-PARTY TAYLOR THOMSON TO INTERVENE AND TO LIMIT THE TESTIMONY OF PAMELA MILLER AT TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES** |

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
RICHARD M. STEINGARD (Cal. Bar No. 106374)
ANGELA J. CLIFFORD (Cal. Bar No. 253778)
333 South Hope Street, 48th Floor
Los Angeles, California 90071-1448
Telephone:  213-620-1780
Facsimile:  213-830-2036
RSteingard@sheppardmullin.com
AClifford@sheppardmullin.com

Attorneys for Third-Party
TAYLOR THOMSON

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANTHONY PELLICANO, et al.,<br><br>Defendant. | Case No. CR 05-1046(E)-DSF<br><br>**NOTICE OF MOTION; MOTION OF THIRD-PARTY TAYLOR THOMSON TO INTERVENE AND TO LIMIT THE TESTIMONY OF PAMELA MILLER AT TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES** |

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on _____, 2008 at ____ a.m./p.m., or as soon thereafter as counsel may be heard in Courtroom 840 of the United States District Court for the Central District of California, third-party Taylor Thomson will and hereby does move to intervene in this action and for an order limiting the trial testimony of government witness Pamela Miller.

| | |
|---|---|
| 1 | This Motion is based upon this Notice, the attached Memorandum of Points |
| 2 | and Authorities, all documents on file with the Court in this matter, and such evidence and |
| 3 | argument as may be presented at the hearing of this motion. |
| 4 | |
| 5 | Dated: April 1, 2008          Respectfully submitted, |
| 6 | |
| 7 | SHEPPARD, MULLIN, RICHTER & HAMPTON LLP |
| 8 | |
| 9 | By  /s/ Richard M. Steingard |
| | RICHARD M. STEINGARD |
| 10 | Attorneys for Third-Party |
| 11 | TAYLOR THOMSON |

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

Taylor Thomson is neither a defendant nor a witness in this case. Nonetheless, she brings this motion to intervene and to limit the expected testimony of Pamela Miller, a disgruntled former employee who is expected to testify as a government witness. For the reasons set forth below, Ms. Thomson fears that this witness, if not restrained, will take advantage of an opportunity to violate two court-ordered injunctions and demean and ridicule Ms. Thomson in this highly-publicized and public trial. Two courts – one in Canada and one in California – have already issued permanent injunctions barring Ms. Miller from revealing confidential information about Ms. Thomson. Here, Ms. Thomson is not seeking to bar Ms. Miller's testimony, but only asks that the Court limit the witness's testimony to that which is *relevant and admissible* and not violative of the pending injunctions.

## II.

## STATEMENT OF RELEVANT FACTS

### A. Ms. Thomson Hires Pamela Miller

Taylor Thomson is a Canadian citizen and, because of her family's extreme success, a public figure, particularly in Canada. From September 11, 2001 to April 4, 2002, Ms. Thomson employed Pamela Miller as a nanny for Ms. Thomson's child. At the time Ms. Miller was hired, she signed an "Employee Confidentiality Agreement," which stated that Ms. Miller would not reveal any confidential information about Ms. Thomson.

1  It also stated that its covenants "shall survive the termination of the Employee's
2  employment with TLT."[1]

3
4      B.    The Child Custody Action
5          During the course of Ms. Miller's employment, Ms. Thomson was involved
6  in a child custody dispute in Canada with her child's father. During this litigation, Ms.
7  Thomson's counsel retained the investigative services of Anthony Pellicano.
8
9          On March 25, 2002, in connection with that dispute, Ms. Miller executed an
10 affidavit attesting to Ms. Thomson's parenting skills and stating that her child was well-
11 adjusted and healthy. Two days later, without Ms. Thomson's knowledge or consent, Ms.
12 Miller phoned the child's father and disclosed confidential information about Ms.
13 Thomson. Ms. Miller also made numerous false and negative statements about Ms.
14 Thomson. Later, Ms. Miller signed a handwritten statement directly contradicting the
15 affidavit that she had earlier given to Ms. Thomson. The statement was filed with the
16 court. The custody proceedings were ultimately resolved through binding arbitration,
17 whereby custody was awarded to Ms. Thomson, thereby further discrediting Ms. Miller's
18 unfold claims.
19
20     C.    The Lawsuits and Injunctions
21         In April, 2002, Ms. Thomson brought an action against Ms. Miller for
22 breaching the confidentiality agreement in her handwritten statements. Ms. Thomson
23 dismissed this matter after Ms. Miller retracted her statements and agreed to an order
24 prohibiting the disclosure of confidential information. The Canadian Court accepted this
25 agreement and issued a permanent injunction stating, "THIS COURT ORDERS that a
26 permanent injunction be and the same is hereby issued prohibiting the disclosure of the

27 ───────────────
   [1]    Copies of all referenced documents are available to the Court through counsel.
28

-4-

1  Plaintiff's Confidential Information as defined in Article 2 of the Employee Confidentiality
2  Agreement dated September 8, 2001 between Pamela Miller and Taylor L. Thomson,
3  unless otherwise required by a court of competent jurisdiction."

5  Over the next several years, Ms. Miller filed two separate lawsuits in Los
6  Angeles courts against Ms. Thomson. In both, Ms. Miller stated that she had been
7  wrongfully terminated and alleged that Ms. Thomson engaged in acts of wrongful conduct,
8  including wiretapping and intercepting her calls.[2] All of the allegations in those lawsuits
9  were resolved against Miller, one by voluntary dismissal and the other by summary
10 judgment for Ms. Thomson.

12 Ms. Thomson responded to Ms. Miller's claims by suing her for malicious
13 prosecution. Ms. Thomson obtained a default judgment against Ms. Miller on the
14 malicious prosecution claim, which necessarily required that Ms. Thomson make a *prima*
15 *facie* case that Ms. Miller's underlying claims lacked probable cause. Ms. Miller sought to
16 have the judgment withdrawn, claiming that she did not respond to the default notice
17 because she had been forced to go into hiding as a result of Ms. Thomson's and Mr.
18 Pellicano's actions.[3] The trial court rejected these claims, as did the Court of Appeals.
19 The judgment was affirmed on appeal and is now final.

21 Additionally, the trial court issued a permanent injunction prohibiting Ms.
22 Miller from disclosing to any third-party any of the following information:

---

[2]  The pending indictment before the Court does not allege that Ms. Miller or her family was subject to illegal wiretaps or interceptions.

[3]  It is counsel's understanding that Mr. Pellicano was already in custody when Ms. Miller claimed she so feared him that she had to go into hiding.

-5-

(i) Any information, documents or other materials related to Taylor L. Thomson, [her child] or their family obtained from any source whatsoever;

(ii) Any information related to Taylor L. Thomson's businesses or the businesses of her family;

(iii) Any information related to personal lives of Taylor L. Thomson, [her child] or the personal lives of any members of their family; and

(iv) Any photographs, films, videos (including negatives, prints or copies) of Taylor L. Thomson [her child], or any member of their family.

The injunction goes on to state as follows:

> Whether the information set forth [] above be contained in written materials, verbal communications, or in Miller's own mind, such information is confidential without regard to the manner in which it was obtained and Miller is enjoined and prohibited from disclosing it to any third parties. Miller is hereby required to maintain secrecy, confidentiality and complete privacy of all such information forever.

D. The Pellicano Trial

In *United States v. Pellicano, et. al*, the government listed Ms. Miller as a prospective witness. To counsel's knowledge, the government has not petitioned the courts that issued the injunctions to request permission to elicit testimony which would otherwise violate the injunctions, nor has the government submitted such an application to this Court. These facts raised Ms. Thomson's concern, as she anticipates that Ms. Miller will use the trial as a forum to repeat her previously rejected claims. In response, Ms. Thomson, through counsel, wrote to the government to advise them of the permanent injunctions and to discuss Ms. Miller's forthcoming testimony. On March 21, 2008, counsel received the government's response, which indicates that the government intends to call Ms. Miller as a witness.

## III.

## ARGUMENT

### A. Ms. Thomson's Request to Intervene

Ms. Thomson seeks to intervene in this matter to protect her rights to confidentiality and limit the scope of Ms. Miller's testimony. In related proceedings, courts have recognized the right of third parties to intervene in criminal proceedings. *United States v. RMI Co.*, 599 F.2d 1183, 1186 (3d Cir. 1979) ("[I]t is settled law that persons affected by disclosure of allegedly privileged materials may intervene in pending criminal proceedings and seek protective orders. . ."); *In Re Grand Jury Subpoenas Issued to Stover v. United States*, 40 F.3d 1096, 1099 n.1 (10th Cir. 1994) ("[T]hose claiming that they will be injured by the disclosure of allegedly privileged material generally have the right to intervene in a pending criminal matter"); *United States v. Feeney*, 641 F.2d 821, 824 (10th Cir. 1981) ("Generally, persons affected by the disclosure of allegedly privileged materials may intervene in pending criminal proceedings and seek protective orders").

Admittedly, Ms. Thomson's circumstances are unique and appear to be a case of first impression. However, two cases provide guidance. In *In Re Grand Jury*, *supra*, a federal grand jury issued a subpoena to the Chief of Police seeking internal records regarding a shooting that had occurred. The Chief moved to quash the subpoena on the grounds that the file contained compelled statements by various officers. The motion to quash was denied and the records were provided. Thereafter, several police officers sought to intervene, claiming that the order compelling disclosure of their prior statements violated their Fifth Amendment rights. The lower court denied their request to intervene, but the Court of Appeals reversed, finding that "[p]ersons situated as the officers in this case; that is, those claiming that they will be injured by the disclosure of allegedly

privileged material, generally have the right to intervene in a pending criminal case." 40 F.3d at 1099 n.1, *citing United States v. Feeney*, 641 F.2d 821, 824 (19th Cir. 1981).

The second case, *United States v. Feeney, supra,* provides additional support for Ms. Thomson's request. There, defendant Feeney was convicted after trial of fraud-related offenses. In a motion for a new trial, Feeney requested the production of tapes and records showing that he had been working for the government as an informant in a bribery case. The court granted the request and, following partial production, ordered a series of witnesses to testify at a hearing.

Prior to the hearing, a Denver newspaper printed an article based on a review of the Feeney recordings which implicated John White, chairman of the Democratic National Committee, in the bribery scandal. Mr. White then sought to intervene in the post-trial hearing and requested "equal access to written materials and tape recordings disclosed to the press." This request was granted. Later, White was subpoenaed to testify at the post-conviction hearing and produce certain records. White moved to quash the subpoena, which was denied. White then appealed the court's ruling. On appeal, Feeney argued, *inter alia*, that White should never have been permitted to intervene. The Court of Appeals disagreed, holding that "White's intervention was to protect himself from 'disclosure of accusations made against him before the grand jury.' As such, he had standing to object to any disclosure and the right to intervene to protect his interests." 641 F.2d at 824 (internal citations omitted).

These cases, while not directly on point, are nonetheless applicable to Ms. Thomson's situation. Two courts have issued order which seek to protect Ms. Thomson from Ms. Miller. Thus, as set forth below, Ms. Thomson requests to intervene based on

-8-

her attempt to protect herself and her child from untruthful allegations and the disclosure of confidential information that are irrelevant to these proceedings.

### B. Ms. Thomson's Request to Limit Ms. Miller's Testimony

Federal Rule of Evidence 611(a) provides that the Court "shall exercise reasonable control" over the ways in which witnesses are interrogated and real evidence is presented in order to avoid wasting time and in order to protect witnesses from harassment, unnecessary embarrassment, or any other improper or abusive tactic. "The trial court's power to control the conduct of trial is broad. Necessarily many matters of trial procedure must be left to the discretion of trial judges." *United States v. Panza*, 612 F.2d 432, 438 (9th Cir. 1979) (agreeing that the district court properly exercised its discretion striking a defendant's testimony because the defendant refused to answer questions on cross-examination and striking the testimony of other witnesses because their testimony was irrelevant to the legal issues in the case ). *See also Halvorsen v. Baird*, 146 F.3d 680, 687 (9th Cir. 1998) (finding a judge did not abuse its discretion in not permitting witnesses to testify and "to keep the evidence out because of the risk of confusion and undue consumption of time").

In the present case, Ms. Thomson is not seeking to bar Ms. Miller's testimony but only asking that the Court honor the injunctions, exercise its discretion and limit Ms. Miller's testimony to that which is relevant, admissible, and not violative of the injunctions. While the law certainly provides for such an order, this request is predicated on three basic facts.

First, in the past, Ms. Miller has made spurious allegations against Ms. Thomson, both in and out of court. These accusations have either been subsequently withdrawn by Ms. Miller, or found to be without merit in a judicial proceeding. Ms. Miller's actions have caused two courts to issue permanent injunctions barring Ms. Miller

-9-

from revealing confidential information. While Ms. Thomson is not claiming that these injunctions legally bar Ms. Miller from testifying to certain non-confidential information at trial, the injunctions do serve as a cautionary signal, a warning sign that in the absence of judicial intervention Ms. Miller will likely use the trial as an opportunity to castigate Ms. Thomson with impunity.

The second reason relates to the manner in which this trial is proceeding. Transcripts reveal that Mr. Pellicano has failed to object to the government's unceasing introduction of irrelevant, prejudicial and inadmissible evidence. While it is possible that this is part of Mr. Pellicano's defense, it seems more likely that Pellicano, acting as his own attorney, is simply unfamiliar with the rules of evidence and the limitations on the admissibility of testimony. Because most of the testimony only concerns Mr. Pellicano, counsel for the co-defendants have, to date, not interposed many (or any) objections to evidence that does not directly relate to their own clients. The government has stepped in to this "perfect storm" of a judicial environment and proceeded to ask patently objectionable questions, leading to what would otherwise be wholly inadmissible testimony. A few examples make this point clear.

During the testimony of Garry Shandling, the prosecutor asked how Mr. Shandling knew that Mr. Pellicano was hired by Brad Grey's legal defense team. Despite the fact that this was irrelevant to the pending charges, purely speculative and called for hearsay, no objection was interposed. Mr. Shandling's monologue of an answer exemplify Ms. Thomson's concerns:

> A.  I knew that because Brad Grey years earlier, about five years earlier, had said to me relative to another lawsuit, "Well, with Bert Fields you get Anthony Pellicano." And I didn't

1  quite know what he meant then it was in reference to.
2  Definitely some specific way of dealing with things because he
3  said, "I don't think you'd want to work that way." And so
4  I never got involved with anything in terms of Bert Fields and
5  Anthony Pellicano.

6  Also, my friend, Gavin DeBecker, is a security expert,
7  and he called me and he said, "We should sweep your phones
8  because I recommend to any client of mine who is in a lawsuit
9  with Bert Fields to have their phones swept because Anthony
10 Pellicano is known to be involved in that." And he came and
11 swept my phones. [3/13/08 RT (A.M. Session) 21-2]

13  Mr. Shandling was also asked about whether Mr. Grey's defense team made
14 public attacks on his credibility. Notwithstanding that the question was entirely irrelevant
15 and objectionable, there was no objection and Mr. Shandling answered:

17  A. It was extraordinarily difficult. They began a press
18  campaign, a spin campaign to assassinate my character instead
19  of addressing the lawsuit and dealing with the lawsuit. They
20  attempted to destroy my character and reputation by repeatedly
21  planting articles in newspapers, in tabloids and in magazines,
22  saying anything they could about me that was negative that
23  would destroy my reputation in the town. It was just basically
24  character assassination that was incredibly intense and was a
25  spiritual test to get through. [3/13/08 RT (A.M. Session) 22]

-11-

1  A second example can be found in the testimony of Los Angeles Deputy
2  District Attorney Karla Kerlin, who prosecuted a rape case involving several victims. The
3  prosecution asked Ms. Kerlin questions designed to elicit information that she had heard
4  during the course of her investigation. Again, without objection, Ms. Kerlin testified as
5  follows

> Q.   Did you become aware of other investigative methods being used with respect to any of these Jane Does, to include people placed in situations where they could be near them?
> A.   Jane Doe 2 was taking an acting class, and she - - her ex-boyfriend was contacted by Mr. Pellicano, who told him that plants had been placed in her acting class. And she had become very fearful of, you know, making relationships or having contact with anyone in the acting class for fear of who was really in the acting class and who were the so-called plants who had been placed in the class.
> Q.   Did you become aware of any of the Jane Does or any of the witnesses receiving harassing or hang-up phone calls at their homes?
> A.   Jane Doe 2 was a primary target for repeated hang-ups. She wrote down the number that those calls were emanating from, and she went out around her neighborhood and did a little investigation and found that they were from pay phones very near to her house.
> Q.   Did you become aware of any break-ins going on with respect to any of the Jane Does's property?

-12-

| | |
|---|---|
| 1 | A. Shortly after the case had been reported, Jane Doe 1's |
| 2 | apartment had been broken into, and she believed some |
| 3 | photographs had been gone through. And she wasn't sure if |
| 4 | any of them had been taken. |
| 5 | . . . |
| 6 | |
| 7 | Q. Did you observe these incidents that you described have any effect on the named victims and the witnesses in your case? |
| 8 | |
| 9 | A. Yes. It was an extremely labor-intensive process for |
| 10 | me, as the primary prosecutor and person with whom the |
| 11 | women had contact, to keep them amenable to going forward |
| 12 | with the criminal prosecution. This was extremely stressful on |
| 13 | them. They weren't sure who to trust, what was going on. |
| 14 | They were scared. They were frightened. Not only were they |
| 15 | feeling harassed, but people around them were feeling harassed |
| 16 | and threatened. And it - - it took a lot of labor, especially |
| 17 | because it took so many years for the case to get to trial, to |
| 18 | keep the women cooperative and willing to stick with it and go |
| 19 | forward. [3/13/08 RT (P.M. Session) 113-5] |
| 20 | |
| 21 | Other instances of similarly objectionable testimony abound. Ms. Thomson |
| 22 | fears that if limitations are not imposed on Ms. Miller, the same sort of free-flowing, |
| 23 | unsubstantiated, irrelevant and inadmissible dialogue may occur. |
| 24 | |
| 25 | Third, this Court should limit Ms. Miller's testimony so that Ms. Thomson |
| 26 | and her young child will not be harmed by unfounded disparaging comments. This matter |
| 27 | is receiving international publicity; Ms. Thomson is a public figure. Unnecessary |
| 28 | inflammatory testimony will only inflict more harm. Two courts have already recognized |

1 | a need to protect Ms. Thomson and her child from Ms. Miller's reckless statements by
2 | issuing permanent injunctions. Ms. Thomson asks that this Court consider the possible
3 | consequences of allowing Ms. Miller an unchecked forum to talk about Ms. Thomson.
4 |
5 | For all of these reasons, Ms. Thomson asks that the Court exercise its
6 | discretion under Rule 611(a) and limit Ms. Miller's testimony to that which is relevant,
7 | admissible, and not in violation of the injections. This would still allow the government to
8 | introduce testimony that (1) in 2001 and 2002, Ms. Miller worked for Ms. Thomson as a
9 | nanny, (2) in 2002, there was a child custody dispute between Ms. Thomson and her
10 | child's father, and (3) Ms. Miller was a prospective witness for the father in that action.
11 | Further, the government could have Ms. Miller identify the names of her relatives who are
12 | referenced on documents found in Mr. Pellicano's office. Beyond these facts and perhaps
13 | a few others of an equally limited nature, Ms. Miller's speculations, opinions and beliefs
14 | are irrelevant to the issues in this case and should not be admitted at trial.

### IV.

### CONCLUSION

Based on the foregoing, Ms. Thomson respectfully request that the Court exercise its discretion and limit the testimony of Pamela W. Miller to that which is relevant and admissible.

Dated: April 1, 2008        Respectfully submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____
    RICHARD M. STEINGARD
    Attorneys for Third-Party
    TAYLOR THOMSON

-14-

# PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles; I am over the age of eighteen years and not a party to the within entitled action; my business address is 333 South Hope Street, 48th Floor, Los Angeles, California 90071-1448.

On April 1, 2008, I served the following document(s) described as **NOTICE OF MOTION; MOTION OF THIRD-PARTY TAYLOR THOMSON TO INTERVENE AND TO LIMIT THE TESTIMONY OF PAMELA MILLER AT TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES** on the interested party(ies) in this action by placing true copies thereof enclosed in sealed envelopes and/or packages addressed as follows:

**SEE ATTACHED SERVICE LIST**

☒ **BY MAIL:** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **BY OVERNIGHT DELIVERY:** I served such envelope or package to be delivered on the same day to an authorized courier or driver authorized by the overnight service carrier to receive documents, in an envelope or package designated by the overnight service carrier.

☐ **BY HAND DELIVERY:** I caused such envelope(s) to be delivered by hand to the office of the addressee(s).

☒ **FEDERAL:** I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on **April 1, 2008**, at Los Angeles, California.

_____
Marilyn D. Vanterpool

## SERVICE LIST

**Anthony Pellicano**
21568-112
MDC Los Angeles
PO Box 1500
Los Angeles, CA 90053
**VIA U.S. MAIL ONLY**

**Adam H. Braun**
Law Offices of Adam H. Braun
1880 Century Park E Ste 710
Los Angeles, CA 90067
**VIA EMAIL AND U.S. MAIL**

**Chad S. Hummel**
Manatt, Phelps & Phillips, LLP
11355 W. Olympic Blvd.
Los Angeles, CA 90064
**VIA EMAIL AND U.S. MAIL**

**Kevin Lally**
**Daniel A. Saunders**
United States Attorney's Office
1500 United States Courthouse
312 No. Spring Street
Los Angeles, CA 90012
**VIA EMAIL AND U.S. MAIL**

**Lawrence Semenza**
1826 Indian Bend Dr
Henderson, NV 89014
**VIA EMAIL AND U.S. MAIL**

**Mona C. Soo Hoo**
624 S Grand Ave., Fl 22D
Los Angeles, CA 90017
**VIA EMAIL AND U.S. MAIL**